United States District Court
Eastern District of North Carolina
Eastern Division

| | |
|---|---|
| Merry Anne Whitfield, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>Life Insurance Company of )<br>North America, )<br>)<br>Defendant. )<br>_____ ) | Complaint |

Plaintiff Merry Anne Whitfield alleges the following for her complaint against defendant Life Insurance Company of North America ("LINA").

## Nature of Controversy

1. Ms. Whitfield worked as a Diversion Control Specialist III ("DCS III") at Purdue Pharma ("Purdue") until she became totally disabled. Purdue provided long-term disability ("LTD") coverage to Ms. Whitfield and other eligible employees pursuant to an insurance policy issued by LINA and bearing group policy number LK-961646 (the "Disability Policy"). The Disability Policy obligates LINA to make eligibility determinations and to pay policy benefits from its funds. The Disability Policy does not grant LINA discretionary authority.

2. Ms. Whitfield became totally disabled due to fibromyalgia, chronic fatigue, and depression, and discontinued work on April 14, 2017. Ms. Whitfield satisfied the Disability Policy's 180-day elimination period and became eligible for LTD benefits on

October 11, 2017. Ms. Whitfield applied for LTD benefits, and LINA denied her claim on October 12, 2017. Ms. Whitfield submitted her first appeal ("first appeal") of LINA's decision on October 24, 2017. LINA denied her first appeal on December 22, 2017. Ms. Whitfield appealed again ("second appeal") on June 18, 2018. LINA upheld its decision to deny Ms. Whitfield benefits on August 16, 2018 and advised Ms. Whitfield that she had exhausted her appellate remedies under the Disability Policy and she had the right to sue to recover her benefits pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA").

3.      Ms. Whitfield claims she is entitled to recover LTD employee benefits from LINA pursuant to 29 U.S.C. § 1132(a)(1)(B) of ERISA. The relief Ms. Whitfield seeks is instatement of her LTD benefits under the Disability Policy retroactive to October 11, 2017, prejudgment interest, monthly LTD benefits for as long as she remains entitled to benefits under the terms of LINA's Disability Policy, and an award of attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).

Parties, Jurisdiction, and Venue

4.      Ms. Whitfield is a citizen and resident of Edgecombe County, North Carolina.

5.      Defendant LINA is an insurance company and is authorized to conduct business in this state by the North Carolina Department of Insurance. LINA is the Disability Policy's claims administrator.

6. The Court has jurisdiction over this controversy pursuant to 29 U.S.C. § 1132(e)(1). Venue is proper in this district pursuant to 29 U.S. C. § 1132(e)(2) because acts and occurrences that gave rise to Ms. Whitfield's claim took place in this district.

Additional Facts

7. The Disability Policy sets out the following definition:

The Employee is considered disabled if, solely because of Injury or Sickness, he or she is:

1. unable to perform the material duties of his or her Regular Occupation; and

2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

Ms. Whitfield's indexed earnings for LTD benefits are approximately $100,070.16 per year. Therefore, the standard of disability used for LINA's administrative review is whether Ms. Whitfield can perform the material duties of her regular occupation and earn at least 80% of her indexed earnings, which equates to approximately $80,056.13 per year.

8. Ms. Whitfield is sixty-two years old. She is the wife of a disabled Vietnam Veteran, Bobby Whitfield, the mother of two sons and two step-daughters, and the grandmother of thirteen grandchildren. At age fifty-eight, she earned her bachelor's degree while working full-time. She wanted to prove to her grandchildren that it is "never too late to better yourself."

9. Ms. Whitfield worked at Purdue for sixteen years. When she was healthy, Ms. Whitfield exercised in Purdue's company gym every day before work. Ms. Whitfield

3

was well compensated as a DCS III and took pride in her work. When Ms. Whitfield became totally disabled and went out of work on April 14, 2017, she was only a few months short of reaching full retirement, which would have given her continued health and life insurance until age 65. Ms. Whitfield had no incentive, financial or otherwise, to prematurely end a successful career and forego full retirement benefits.

10. Purdue is the manufacturer of OxyContin, an opioid medication that is used to treat the most severe pain. Ms. Whitfield worked on Purdue's regulatory compliance team that implemented and enforced policies and procedures for the production, processing, storage, and shipping of OxyContin, and ensured that Purdue remained compliant with schedule II narcotic regulations issued by the Drug Enforcement Administration ("DEA"), the Food and Drug Administration ("FDA"), and state regulators. Ms. Whitfield worked throughout the entire Purdue plant and had to learn the intricacies and regulations of each job function in the plant. She monitored 300+ employees on 350+ security cameras to spot abnormalities that might put Purdue at risk, such as employees stealing or using OxyContin, employees being exposed to raw opium derivatives, or unsafe manufacturing practices that could taint medication. Ms. Whitfield testified that she treated Purdue's medication as if her mother or child was taking it.

11. Ms. Whitfield's job as a DCS III was also physically demanding. Every day, she had to climb a forty-foot ladder in Purdue's warehouse to weigh and count Purdue's inventory of OxyContin tablets and capsules. She performed tedious calculations to ensure that shipping packages of various configurations held the correct number of bottled and blister packed tablets. She weighed each package to make sure the

4

outgoing shipping weight was correct. If there was even a slight variance in shipping weight, she had to disassemble the pallet, packages, and/or twenty-kilogram drums, until she found the package or packages that were light. Then, she would have to identify the cause of the variance, be it employee theft, machine defects, packaging errors, or other causes.

12. Ms. Whitfield also worked in an air-tight, controlled manufacturing and packaging facility. While working in this area, Ms. Whitfield was required to wear a Tyvek suit that included a full hood, battery-powered air purifying respirator, hair net, and double shoe covers because there was raw opium derivative powder floating in the air. The FDA and DEA regulations required Ms. Whitfield to vacuum this fine powder off herself when she left the facility and to weigh and account for the powder, down to the allowed milligram variance. She then had to process and destroy the raw opium powder and take exacting records each step of the way.

13. Ms. Whitfield also worked in Purdue's vault, where Purdue stored shelves of tablets, capsules, and fifty-five-gallon drums of raw opium derivative. She had to precisely organize each item by expiration date, lot number, and other identifying markers. She had to know exactly where each item was and when it was due to be destroyed. Again, she performed exact counts for each item and went through a complex chain of custody process to transport and destroy expired medication and materials.

14. Federal and state regulators performed surprise site visits at Purdue. During those visits, Ms. Whitfield would have to walk through Purdue's facilities, pull pallets and lots of medication and materials, and provide accompanying paperwork for all

5

controlled substances. If she made even a slight mistake, Purdue would be subject to fines and/or regulatory penalties and she would be subject to individual fines as well. Simply put, there was no room for error in Ms. Whitfield's role as a DCS III, and she had to demonstrate unfettered integrity, honesty, and diligence at Purdue.

15. Ms. Whitfield testified that she had top reviews each year and received the maximum merit-based bonus each year. Her manager, who had previously worked as a DEA agent for thirty-five years, told her that he wished he had ten of her on his team.

16. Ms. Whitfield was diagnosed with fibromyalgia in 2010. She was later diagnosed with chronic fatigue and depression. Despite her diagnoses, Ms. Whitfield was determined to work as long as she could. She fell asleep driving to work several times, and once fell asleep at her desk, which caused her to fall and cut her chin open.

17. Ms. Whitfield testified that her fibromyalgia causes widespread body pain, muscular pain, weakness, nerve pain, brain fog, memory loss, confusion, and a headache that has lasted years without cessation. She testified that her fibromyalgia pain is so bad that the weight of one bed sheet against her skin is unbearable some nights. She testified that her brain fog and memory loss cause her to misplace items, forget directions, and not discern basic things like whether her car engine is running or not.

18. Dr. Laura Black, a fibromyalgia specialist, examined Ms. Whitfield on April 13, 2017. Dr. Black stated that Ms. Whitfield is unable to perform any strenuous duties and has difficulties with the activities of daily living. Ms. Whitfield's widespread pain index score was ten out of twelve. After examination, Dr. Black found that Ms. Whitfield "clearly meets" the clinical criteria and the American College of

Rheumatology's criteria for fibromyalgia. Dr. Black took Ms. Whitfield out of work and prescribed her a handicap parking placard. At Dr. Black's direction, Ms. Whitfield discontinued work on April 14, 2017.

19. Dr. Black next examined Ms. Whitfield on May 30, 2017. She found that Ms. Whitfield's pain and memory loss were worse than before. Ms. Whitfield reported continued exhaustion even though she slept "like a rock" for twelve hours per night. Ms. Whitfield also described how she developed extreme weakness and could no longer hold her two-year-old great-granddaughter.

20. Dr. Black administered a cardiopulmonary exercise test ("CPXT") on Ms. Whitfield on July 12 and 13, 2017, using the Stevens' test/re-test protocol. Dr. Black directed Ms. Whitfield to ride a bicycle ergometer for seven minutes each day and measured Ms. Whitfield's respiratory oxygen uptake ("$VO^2$"), heart rate, and bicycle energy output measured in watts. After two days of testing, Dr. Black found that Ms. Whitfield had a below-normal aerobic work capacity ("$VO^2$ max") that was typical of a person who suffered from chronic fatigue syndrome. Dr. Black measured the impact of physical activity on Ms. Whitfield's body using metabolic equivalents ("METs"), which are units that are based on an equation that contemplates the body's rate of oxygen consumption. Dr. Black also evaluated Ms. Whitfield's anaerobic threshold, which is the exertion level at which the body switches from aerobic to anaerobic metabolism and produces lactic acid. Dr. Black stated that it takes 1.7 METs of energy for a person "just to sit comfortably" and 1.9 METs of energy "to sit and read and write." Dr. Black found that Ms. Whitfield's anaerobic threshold was 1.8 METs. Dr. Black stated that such a low

7

threshold at such a low oxygen consumption rate showed that normal daily activities demanded more energy and oxidative metabolism than Ms. Whitfield was capable of producing. Applied to the workplace, Dr. Black stated that Ms. Whitfield did "not demonstrate sufficient energy to sustain even sedentary activity on a sustained basis." In forming this opinion, Dr. Black ruled out other variables such as deconditioning, suboptimal effort, and psychological factors.

21. Dr. Black completed LINA's Physical Abilities Assessment Form ("PAA form") on September 20, 2017. She wrote that Ms. Whitfield "is unable to perform any type of activity, even sedentary, on a regular, predictable or sustained basis." Dr. Black stated that Ms. Whitfield could not return to work, even with accommodations. Dr. Black advised that Ms. Whitfield was to avoid extreme temperatures, moisture, noise, chemicals, fumes, and physical or mental stress, all of which could exacerbate her fibromyalgia symptoms.

22. On September 24, 2017, Ms. Whitfield's primary care provider, Dr. Christine Barton, completed LINA's PAA form. Dr. Barton stated that Ms. Whitfield fatigued easily and had chronic overall pain.

23. On September 26, 2017, Ms. Whitfield's rheumatologist, Dr. Kyle Harner, completed LINA's PAA form. He did not answer LINA's question about Ms. Whitfield's work capacity and instead stated, "I did not take patient out of work."

24. Ms. Whitfield applied for LTD benefits. LINA denied her claim on October 12, 2017.

25. On October 23, 2017, Dr. Harner wrote LINA a letter to provide greater clarity regarding his PAA form. Dr. Harner wrote:

> I am writing this as a letter of clarification for Ms. Whitfield. I am seeing her in the office today and want to state that I NEVER said she was not disabled. I only stated that I was NOT the doctor that took her out of work to start her short term disability. I felt it was best for the doctor that started that process to continue the process.
>
> At this time, I would like to state that all three of her doctors, myself included, feel that Ms. Whitfield is unable to work. This is related to a combination of both physical and mental limitations related to her underlying diagnosis of fibromyalgia syndrome and depression/anxiety.
>
> At this point, I recommend (along with Dr. Black and Dr. Barton) that Ms. Whitfield be placed on long-term/permanent disability.

26. Ms. Whitfield's first appeal of LINA's decision to deny her LTD benefits was received by LINA on October 24, 2018. LINA hired two consultants to review Ms. Whitfield's claim: occupation medicine provider Dr. Roger Belcourt and psychiatrist Dr. Elbert Greer Richardson. Neither consultant examined Ms. Whitfield.

27. Dr. Belcourt issued his report on December 1, 2017. Dr. Belcourt stated that he had spoken to Dr. Harner on November 29, 2017. According to Dr. Belcourt, during the call Dr. Harner advised Dr. Belcourt that Ms. Whitfield could not return to "her previous high-demand job" as a DCS III because her chronic pain only allowed her "to sit or stand for up to 10 minutes before needing to change positions." In his report, Dr. Belcourt conceded that the results of Ms. Whitfield's CPXT showed she had a "lower than normal aerobic work capacity that is typical of a person with Chronic Fatigue Syndrome." Dr. Belcourt found that Ms. Whitfield was impaired due to chronic fatigue syndrome but did not address her fibromyalgia or chronic pain. Despite medical evidence

9

to the contrary, Dr. Belcourt stated that Ms. Whitfield could perform "a light physical demand level occupation with appropriate breaks as needed." Dr. Belcourt did not reconcile his opinion with Ms. Whitfield's CPXT test results.

28. Dr. Richardson issued a report on December 4, 2017. Dr. Richardson stated that he had called Dr. Barton. According to Dr. Richardson, during the call Dr. Barton said she supported Ms. Whitfield's disability claim and advised Dr. Richardson that Ms. Whitfield was disabled due to fibromyalgia, chronic pain, and "brain fog." Dr. Richardson also called Dr. Black, who advised him that Ms. Whitfield's cognitive functioning was so poor that she "got behind the wheel recently, cranked the car and forgot what to do next." Dr. Black informed Dr. Richardson that Ms. Whitfield's pain and memory had worsened and stated that stress and weather conditions exacerbated Ms. Whitfield's symptoms. Dr. Richardson concluded that Ms. Whitfield had a history of depression that was related to her declining health. Dr. Richardson stated that Ms. Whitfield's depression did not prevent her from working and diagnosed her with mild neurocognitive disorder, but deferred to neuropsychologists as to whether her disorder presented a functional limitation.

29. Based on Dr. Belcourt's and Dr. Richardson's opinions, LINA upheld its denial of benefits on December 22, 2017.

30. On March 5, 2018, Ms. Whitfield had her first appointment with clinical psychologist Dr. Evans Harrell. Dr. Harrell administered the Beck Depression Inventory and found that Ms. Whitfield scored in the severely depressed range. Dr. Harrell

diagnosed Ms. Whitfield with major depressive disorder, recurrent, severe, and stated the following:

> I really don't think there is the slightest doubt that she is very depressed. Speaking of the company's unwillingness to exceed to her claim for disability benefits, she says quite rationally, 'Why would I walk away from a job which I loved when I was going to have full retirement in a few months?

31.     On March 13, 2018, Ms. Whitfield was referred to Dr. Benjamin Thomas to treat her confusion and brain fog. Dr. Thomas reviewed a July 21, 2017 MRI of Ms. Whitfield's brain and told her that her brain had shrunk to the size of a seventy-year-old's brain. Dr. Thomas directed Ms. Whitfield to continue treatment with Dr. Black and her other providers.

32.     On April 10, 2018, Dr. Black examined Ms. Whitfield. Dr. Black stated Ms. Whitfield "is doing worse this year." Dr. Black noted that Ms. Whitfield was receiving injections of Toradol, a steroid for fibromyalgia pain, every four to six weeks. Ms. Whitfield told Dr. Black that she could "barely stand it" when the weather changed because the weather change exacerbated her pain. Dr. Black stated Ms. Whitfield has "no pain free or headache free days" and that Ms. Whitfield "forgets a lot of things." Dr. Black stated that Ms. Whitfield has trouble keeping up with bills and mail and frequently misplaces items. Dr. Black stated Ms. Whitfield has trouble with word finding and "often loses her train of thought midsentence." Dr. Black addressed Ms. Whitfield's physical abilities and stated Ms. Whitfield has difficulty working overhead, manipulating small objects, holding things, kneeling, bending, stooping, and getting up from a chair.

33. On May 10, 2018, Ms. Whitfield was referred to psychiatrist Dr. K. M. Verma. Dr. Verma noted in his report that Ms. Whitfield was downcast, flat, unhappy, depressed, anxious, and "near tears" during the appointment. Her depression was an eight out of ten and her pain was a seven out of ten. Ms. Whitfield advised Dr. Verma that she had "no pain free days." Dr. Verma prescribed Geodon, an antipsychotic medication.

34. Dr. Verma next examined Ms. Whitfield on June 7, 2018. Dr. Verma wrote a supportive letter on Ms. Whitfield's behalf and stated, "she is not able to function in any kind of job, due to her emotional and physical health . . . ."

35. Ms. Whitfield submitted her second appeal on June 18, 2018. She submitted sworn testimony with a DVD recording and transcript of her testimony; Dr. Verma's supportive letter; updated medical records from all of her providers; journal entries in which she documented her fatigue, pain, and brain fog; and supportive letters from two friends who saw her health rapidly decline.

36. LINA hired psychiatrist Dr. M. Antoinette Acenas and occupational medicine provider Dr. Joseph Rea to review Ms. Whitfield's claim. Neither provider examined Ms. Whitfield.

37. Through a letter dated July 26, 2018, LINA informed Ms. Whitfield that Dr. Acenas and Dr. Rea would call her providers to discuss her claim. Ms. Whitfield immediately objected when she received LINA's letter. Ms. Whitfield informed LINA that there is "often an unfortunate dispute concerning what was said" between hired insurance consultants and a claimant's providers. To avoid this dispute, Ms. Whitfield asked that Dr. Acenas and Dr. Rea submit written questions to her providers, so there

12

would be no dispute about her providers' opinions. Days later, Ms. Whitfield learned that LINA ignored her objection and request for written questions, and directed Dr. Acenas and Dr. Rea to contact her providers. Ms. Whitfield wrote LINA again to renew her objection and request for written questions. LINA did not respond.

38. Dr. Acenas issued her report on August 3, 2018. She stated she called Dr. Harrell, who stated that Ms. Whitfield is "very depressed due to her chronic pain . . . ." Dr. Acenas diagnosed Ms. Whitfield with mood disorder due to physiological condition with mixed features, and stated that unemployment and chronic pain were psychosocial stressors for Ms. Whitfield. Despite those findings, Dr. Acenas concluded that Ms. Whitfield was not disabled from a mental health perspective because her providers reported "normal" mental health exam findings "except for [her] depressed mood." Dr. Acenas also found Ms. Whitfield was not disabled because she was not in inpatient psychiatric hospitalization.

39. Dr. Rea issued his report on August 7, 2018. He stated that he left voice messages at Dr. Black's office and Dr. Harner's office, and spoke to Dr. Barton. Dr. Barton advised Dr. Rea that Ms. Whitfield had "foggy thinking" and had pain "all the time" from her fibromyalgia. Dr. Barton advised that she had treated Ms. Whitfield for many years, during which Ms. Whitfield's health considerably declined. Dr. Barton stated Ms. Whitfield was not "the same person I once knew." Dr. Rea concluded that Ms. Whitfield had fibromyalgia and chronic fatigue syndrome and imposed the following limitations:

13

> Suggested limitations would include: To lift, push, pull, or carry up to 10 pounds on an occasional basis; to stand for up to 20 minutes at a time and for up to three hours over an eight-hour interval of time; to walk for up to 15 minutes at a time and for up to a total of one hour over an eight-hour span of time; to not squat, crouch, balance, position at unprotected heights, or crawl; and to limit to a rare or less than occasional frequency of climbing stairs with a hand railing, or kneeling, to a cumulative total of 15 minutes over an eight-hour interval. There is not indication for limitation regarding reaching in any direction, stooping, bending, or in general hand usage (handling, fingering, grasping, gripping, feeling, and keyboarding).
>
> These limitations are expected to be permanent in length.

Dr. Rea did not explain how these limitations would affect Ms. Whitfield's ability to perform her material job duties as a DCS III. Dr. Rea did not reconcile these limitations with Dr. Black's CPXT test results, which showed that Ms. Whitfield did not have the energy to perform even sedentary tasks on a sustained basis.

40. LINA referred Ms. Whitfield's claim to vocational rehabilitation specialist Darci Bakos. Ms. Bakos determined that Ms. Whitfield's occupation as a DCS III at Purdue was comparable to the sedentary job of Program Manager, as defined by the Dictionary of Occupational Titles ("DOT") 189.167-030. Ms. Bakos stated such a sedentary job "requires sitting most of the time, with brief periods of standing or walking . . . ." Ms. Bakos accepted Dr. Rea's restrictions without explanation or further scrutiny, and determined that such restrictions were consistent with the physical demands of a Program Manager as defined by the DOT. Ms. Bakos did not address the 80% income qualifier in the Disability Policy's definition of disability or identify any employers that would be willing to hire Ms. Whitfield, for a job that would pay at least $80,056.13 per year.

41. LINA denied Ms. Whitfield's second appeal through a letter dated August 16, 2018. LINA stated, "there are findings which reflect that Ms. Whitfield has some deficits which support the need for limitations and work restrictions" but such restrictions "would not prevent Ms. Whitfield from performing the duties of her Regular Occupation." LINA advised Ms. Whitfield that she had exhausted her appellate remedies and had the right to sue to recover benefits under ERISA.

42. Ms. Whitfield testified that she still feels like a "broken person." She "does not have control" of her life, and is "stuck in a body that doesn't function." She reiterated that she had to discontinue work for her safety, Purdue's safety, Purdue's consumers' safety, and that she had no financial incentive to prematurely end a successful, lucrative career, just months short of reaching full retirement benefits.

Claim for Relief
(29 U.S.C. § 1132(a)(1)(B) and (g))

43. The other allegations of this complaint are incorporated by reference.

44. The Disability Policy is an employee welfare benefit plan within the meaning of ERISA. Ms. Whitfield is covered by the Disability Policy.

45. LINA failed to provide Ms. Whitfield a full and fair review of her claim for benefits under the Disability Policy.

46. Ms. Whitfield is entitled to recover from LINA long-term disability benefits under the Disability Policy from October 11, 2017 to the date of judgment, with prejudgment interest, and continuing monthly benefits after the date of judgment for as long as she remains eligible under the terms of the Disability Policy.

47. Ms. Whitfield requests an award of attorney's fees and costs against LINA pursuant to 29 U.S.C. § 1132(g).

## Prayer for Relief

Wherefore, having complained of LINA, Ms. Whitfield prays the Court for the following relief:

1. A judgment that LINA is obligated under the terms of the Disability Policy to pay Ms. Whitfield long-term disability benefits for the period from October 11, 2017 to the date of judgment, with prejudgment interest;

2. A judgment that LINA is obligated to pay Ms. Whitfield monthly disability income benefits after the date of judgment for as long as she remains eligible for such benefits under the terms of the Disability Policy;

3. An award of attorney's fees and costs against LINA pursuant to 29 U.S.C. § 1132(g); and

4. Such other relief as the Court deems just and proper.

October 24, 2018
Date

/s/ Daniel Watts
Daniel Watts
N.C. State Bar Number 49598
Andrew Whiteman
N.C. State Bar Number 9523
Whiteman Law Firm
5400 Glenwood Ave., Suite 225
Raleigh, North Carolina 27612
Tel: (919) 571-8300
Fax: (919) 571-1004
dcw@whiteman-law.com
aow@whiteman-law.com